UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| T-MOBILE NORTHEAST LLC, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. |
| | ) |
| THE TOWN OF BARNSTABLE, | ) |
| THE TOWN OF BARNSTABLE ZONING | ) |
| BOARD OF APPEALS, and ALEX | ) |
| RODOLAKIS, MARK HANSEN, | ) |
| HERBERT BODENSIEK, PAUL | ) |
| PINARD, and TODD WALANTIS, in | ) |
| their capacity as Members of the TOWN | ) |
| OF BARNSTABLE ZONING BOARD | ) |
| OF APPEALS, THE TOWN OF | ) |
| BARNSTABLE PLANNING BOARD, | ) |
| and, PATRICK FORAN, WALTER | ) |
| WATSON, STEVEN COSTELLO, | ) |
| FRED LASELVA, JEFFREY SWARTZ, | ) |
| and MARY BARRY, in their capacity as | ) |
| Members of the TOWN OF | ) |
| BARNSTABLE PLANNING BOARD, | ) |
| | ) |
| Defendants. | ) |

_____)

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND EXPEDITED TREATMENT**

For its Complaint against Defendants Town of Barnstable, Town of Barnstable Zoning

Board of Appeals, Alex Rodolakis, Mark Hansen, Herbert Bodensiek, Paul Pinard, and Todd

Walantis, Town of Barnstable Planning Board, Patrick Foran, Walter Watson, Steven Costello,

Fred LaSelva, Jeffrey Swartz, and Mary Barry (collectively, the "Town"), Plaintiff T-Mobile

Northeast LLC ("T-Mobile"), by its undersigned attorneys, upon knowledge as to its own actions

and dealings and upon information and belief as to the Town and its actions, alleges as follows:

1

**Nature of the Action**

This action arises out of the Town's unlawful denial of T-Mobile's applications for a Regulatory Agreement from the Planning Board and a Special Permit and Use Variance from the Zoning Board of Appeals to operate a stealth wireless telecommunications facility hidden in the steeple of the South Congregational Church.  The Town's denials are not supported by substantial evidence contained in a written record, they effectively prohibit personal wireless service in the vicinity of the proposed facility, and the denials are unlawful because they were based on concerns over the environmental effects of radio frequency emissions.  Accordingly, the Town's denial of T-Mobile's application violates the federal Communications Act, as amended, 47 U.S.C. § 332(c)(7) (the "Communications Act" or "Act").  In addition to declaratory judgment, T-Mobile seeks an order from this Court directing the Town to grant T-Mobile's application for the proposed facility in accordance with T-Mobile's rights under the Communications Act.

T-Mobile requests expedited treatment of this complaint pursuant to 47 U.S.C. § 332(c)(7)(B)(v).

**Parties**

1.      Plaintiff, T-Mobile Northeast LLC, is a Delaware limited liability company and a wholly owned subsidiary of T-Mobile USA, Inc., a Delaware corporation with its principal place of business in Bellevue, Washington.  T-Mobile Northeast LLC is registered to do business in the Commonwealth of Massachusetts and maintains an office at 15 Commerce Way, Suite B, Norton, Massachusetts.  T-Mobile Northeast LLC is the operating entity for T-Mobile USA in the Northeast Region, including the Commonwealth of Massachusetts.  T-Mobile Northeast LLC owns and operates assets including cell sites used to provide Personal Communications Services

2

(PCS) and Advanced Wireless Services (AWS), as defined by federal law.  T-Mobile Northeast LLC operates its wireless network using licenses issued by the Federal Communications Commission ("FCC") to T-Mobile USA and held by related entities.  T-Mobile Northeast LLC provides wireless communications services including voice, data and wireless broadband internet services throughout the New England states as part of T-Mobile USA's national wireless network.

2.      Defendant the Town of Barnstable ("Town") is a duly authorized municipality constituted and existing under the laws of the Commonwealth of Massachusetts.

3.      Defendant the Town of Barnstable Zoning Board of Appeals ("ZBA") is a duly authorized unit of the Town that has been delegated the authority, among other things, to grant special permits and use variances, for wireless communications facilities under the Town's Zoning Bylaw.

4.      Defendants Alex Rodolakis, Mark Hansen, Herbert Bodensiek, Paul Pinard, and Todd Walantis served as members of the ZBA that denied T-Mobile's applications at issue in this action.  Each individual defendant is named solely in his or her capacity as a ZBA member.

5.      Defendant the Town of Barnstable Planning Board (the "Planning Board") is a duly authorized unit of the Town that has been delegated the authority, among other things, to recommend to the Town Council that the Town enter into regulatory agreements that regulate the development of certain properties within the Town, including those located in the Centerville Village Zoning District.

6.      Defendants Patrick Foran, Walter Watson, Steven Costello, Fred LaSelva, Jeffrey Swartz, and Mary Barry served as members of the Planning Board that declined to recommend

that the Town enter into a regulatory agreement with T-Mobile.  Each individual is named solely in his or her capacity as a Planning Board Member.

## Jurisdiction and Venue

7.      This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1331 because of the existence of federal questions arising under the Communications Act of 1934, as amended by the Telecommunications Act of 1996.  The Court has authority to issue declaratory judgment relief pursuant to 28 U.S.C. § 2201(a).

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b), since the Defendants each reside in this District, and the events giving rise to this action occurred in this District.

## Statement of Facts

### Federal Statutory Control Over Wireless Siting

9.      Section 332 of the Act, 47 U.S.C. § 332(c), governs federal, state and local government regulation of the siting of personal wireless service facilities such as the one at issue here.

10.      The Act provides that any person adversely affected by a state or local government's act, or failure to act, that is inconsistent with § 332(c)(7) of the Act may seek review in the federal courts and the court "shall hear and decide such action on an expedited basis."  47 U.S.C. § 332(c)(7)(B)(v).

### The Wireless Communications Service Industry

11.      T-Mobile provides commercial mobile radio services, personal and advanced wireless services, as well as other telecommunications services, as those terms are defined under federal law, in the New England market, which includes the Town of Barnstable.

12.     T-Mobile Northeast LLC, as the operating entity for T-Mobile USA, uses licenses issued by the FCC, pursuant to 47 U.S.C. § 151 to provide wireless service in the Town of Barnstable.

13.     Section 151 of the Communications Act establishes a national policy to "make available, so far as possible, to all people of the United States, without discrimination … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communications . . . ." 47 U.S.C. § 151.

14.     Consistent with these policy goals, T-Mobile seeks to provide myriad wireless services to local businesses, public safety entities and the general public.

15.     Likewise, to advance the national policies enumerated under 47 U.S.C. § 151 and repeatedly reiterated by the FCC, T-Mobile constructs wireless facilities that allow T-Mobile to create and maintain a network of "cell sites," each of which consists of antennas and related electronic communications equipment designed to send and receive radio signals.

16.     To provide reliable service to a user, coverage must overlap in a grid pattern resembling a honeycomb.  If T-Mobile is unable to construct a cell site within a specific geographic area, T-Mobile will not be able to provide reliable service to the consumers within that area.

17.     For a wireless network to perform, cell sites must be located, constructed and operated so that reliable service can be achieved.  If there is no functioning cell site within a given area, or if the cell sites serving an area lack sufficient capacity to handle the amount of customer demand for limited wireless spectrum, there will be no reliable service for customers

5

within that area, and customers who live or travel in the area will experience an unacceptable level of dropped calls and call connection failures.

18.     To determine where a new wireless facility is required, radio frequency ("RF") engineers use various techniques, such as sophisticated computer programs and field testing, to complete a study, which shows where cell sites need to be located in order to provide service. The study takes into account the topography of the land, the coverage boundaries of neighboring cell sites, and other factors.  For a wireless network to perform, cell sites must be located, constructed and operated so that reliable service can be achieved.  If there is no functioning cell site within a given area, or if the cell sites serving an area lack sufficient capacity to handle the amount of customer demand for limited wireless spectrum, there will be no reliable service for customers within that area.

### The Proposed Facility and Application Process

19.     Based upon research and analysis by its radio frequency ("RF") engineers, T-Mobile determined that it has a significant gap in its ability to provide service in the Barnstable area in the vicinity of and surrounding 565 Main Street, Centerville (the "Subject Property"), a 1.38 acre lot located at the intersection of Main Street and Church Hill Road, which is in the vicinity of residential homes, commercial establishments, and Craigsville Beach, a popular tourist destination.

20.     This gap is significant based on the population served and traffic in the area, and must be remedied in order for T-Mobile to provide service to the targeted area.

21.     T-Mobile's RF engineers identified a search area within which a new facility would need to be constructed to remedy the significant gap in service.  T-Mobile then investigated suitable properties within the area that were appropriate for a wireless

communications facility.  An appropriate candidate would have to fill the gap in service, comply

with the local zoning requirements, be leasable, and be capable of having a facility constructed.

22.     T-Mobile determined that there are no existing communications towers or tall

structures in the search area that can accommodate co-location and remedy T-Mobile's

significant gap in service.

23.     T-Mobile investigated thoroughly the possibility of other viable alternatives

before concluding no other feasible plan besides the Proposed Facility at the Subject Property

was available.

24.     Specifically T-Mobile considered multiple other properties in the vicinity of the

Subject Property, including: (1) a cupola at Christian Camp Meeting Association, located at 915

Craigsville Beach Road; (2) a chimney at Christian Camp Meeting Association, located at 25

Prospect Avenue; (3) Trade Winds Development-A, Inc., located at 780 Craigsville Beach Road;

(4) Our Lady of Victory Church, located at 230 South Main Street; (5) Beach Club of

Craigsville, located at 27 Long Beach Road; and (6) the Centerville Water Tower, located at 345

Old Stage Road.

25.     T-Mobile considered locating the Proposed Facility on a cupola at Christian

Camp Meeting Association, located at 915 Craigsville Beach Road.  However, this site did not

have the height needed to cover the significant gap, and significant construction would be needed

to elevate or widen the cupola to allow the antennas to fit.  The construction would not fit the

characteristics of the building.  Moreover, the property owner, Jim Lane, was contacted and

indicated that he was not interested in leasing to T-Mobile.  Accordingly, this property is not a

viable option.

26.     T-Mobile considered locating the Proposed Facility on a chimney at Christian Camp Meeting Association. Located at 25 Prospect Avenue.  However, the chimney was not structurally capable of supporting the needed facility.  Moreover, the property owner, Jim Lane, was contacted and indicated that he was not interested in leasing to T-Mobile.  Accordingly, this property is not a viable option.

27.     T-Mobile considered locating the Proposed Facility on the roof of Trade Winds Development-A, Inc., located at 780 Craigsville Beach Road.  Adding a large chimney or cupola to make the antenna stealth would not match the characteristics of the structure.  More importantly, the property is located outside of the search ring and therefore would not remedy the service gap.  Accordingly, this property is not a viable option.

28.     T-Mobile considered locating the Proposed Facility in the steeple of Our Lady of Victory Church, located at 230 South Main Street.  The steeple would have needed to be completely redesigned to conceal the proposed antenna.  The pastor of the Church, Father John Perry, was contacted, and he communicated that the parish is not interested in leasing to T-Mobile.  Accordingly, this property is not a viable option.

29.     T-Mobile considered locating the Proposed Facility on the roof of the Beach Club of Craigsville, located at 27 Long Beach Road.  T-Mobile would need to construct a new cupola to conceal the proposed antenna.  Moreover, this site did not meet the required height needed to remedy the significant gap.  Accordingly, this property is not a viable option.

30.     T-Mobile considered locating the Proposed Facility on the Centerville Water Tower.  Due to the presence of other wireless antennas on the site, the only available location was at 110 feet.  T-Mobile's RF engineers determined that the site was too far from the search

ring and would not provide coverage or capacity required to remedy the significant gap. Accordingly, this property is not a viable option.

31.    After thoroughly evaluating alternative properties within the applicable search area, T-Mobile concluded that the Subject Property was (1) in the search area; (2) in a zone that permitted wireless communications facilities; (3) had a property owner willing to lease a portion of land for the construction of a wireless communications facility; and (4) was suitable for constructing and maintaining a wireless communications facility.

32.    T-Mobile agreed to lease terms with the owner of the Subject Property, and T-Mobile has a current lease with the owner of the Subject Property.

33.    The Subject Property is located within the Centerville Village Zoning District ("CVD").

34.    After consultation with the Town's Planning Department Staff, the Town's property records, and the Town's Zoning Map, the Town's Planning Staff and T-Mobile determined that the Subject Property was located in a CVD zone and as a result, the Proposed Facility was permitted by right.  None of the Town property records or zoning maps showed the existence of a District of Critical Planning Concern ("DCPC").

35.    T-Mobile submitted a request for a building permit from the Town's Building Inspector.

36.    Section 240-107 of the Town's Zoning Bylaw sets forth the requirements for any personal wireless facility to be constructed in all of the Town's zoning districts.

37.    Section 240-109.D of the Town's Zoning Bylaw permits an antenna to be built as of right in any zoning district, provided that the antennas are completely enclosed within an existing structure, and provided that the other equipment is located within an existing building.

38.     Pursuant to Section 240-109.D of the Town's Zoning Bylaw, T-Mobile was granted a building permit from the Town on September 25, 2017.

39.     Construction commenced shortly thereafter, and was substantially completed on January 29, 2018.  T-Mobile ultimately installed six wireless communications antennas, together with Remote Radio Heads, within the existing steeple of South Congregational Church at a centerline height of sixty (60) feet, and installed ancillary equipment in the church's basement. The totality of the development sought in T-Mobile's applications, and that actually constructed on the Subject Property, will be referred to throughout as the "Proposed Facility."

40.     After construction was substantially completed, subsequent conversations occurred between T-Mobile, the Town, and various citizens of the Town organized as the "Centerville Concerned Citizens," which ultimately led to T-Mobile voluntarily agreeing not to turn the Proposed Facility "on-air" pending the outcome of future permitting.

41.     After construction was substantially completed and concerns were communicated to T-Mobile, T-Mobile learned that in addition to being within the Centerville Village Zoning District, the Subject Property is also in an area designated as a District of Critical Planning Concern ("DCPC") pursuant to a Home Rule Amendment and the Cape Code Commission Act. The DCPC allows for creation and adoption of local special rules and regulations to govern development or other land uses within designated districts.

42.     Notwithstanding the fact that the Town had already granted T-Mobile a valid building permit for construction of the Proposed Facility, and after the fact that T-Mobile had substantially completed constructed the Proposed Facility, the Town took the position that the DCPC prevents T-Mobile from operating the Proposed Facility because the list of permitted uses under the CVD does not explicitly include the provision of personal wireless services.

43.     Section 240-130.4.B(2) of the Town's Zoning Bylaw permits the Town to grant a Special Permit for a "change, alteration or expansion of a building or structure" that does not qualify as-of-right.

44.     Section 240-125.B(1)(e) of the Town's Zoning Bylaw permits the ZBA to authorize variances for uses in accordance with the provisions of the Zoning Bylaw.

45.     Section 240-108 of the Town's Zoning Bylaw permits the ZBA to grant a Special Permit for mounting an antenna on any existing structure in any zoning district.

46.     Section 240-130.3 of the Town's Zoning Bylaw allows uses not explicitly contained in the Zoning Bylaw in the CVD subject to a regulatory agreement with the Town.

47.     Section 168 *et seq.* of the Town's Bylaw gives the Town the ability to enter into "regulatory agreements" with entities that have development rights over property, which establish the development regulations that apply to the subject property.

48.     Section 168-5 of the Town's Bylaw requires that the Planning Board approve any regulatory agreement by majority vote before it can be approved by the Town Council and executed by the Town Manager.

49.     The Proposed Facility is located entirely within an existing structure, and its associated equipment is located in the basement of the Church.

50.     The Town has acknowledged that many of the public comments objecting to the Proposed Facility focused on concerns about the harmful health and environmental effects of RF emissions.

**The Zoning Application**

51.     As the result of consultation with the Town, T-Mobile submitted an application for Site Plan Review to the Town's Site Plan Coordinator on August 17, 2018 that included a Site Plan Application Form, plans for the Proposed Facility, and Stealth Design Specifications.

52.     After meeting with the Planning Coordinator at the Site Plan Review meeting, T-Mobile submitted to the ZBA its application for a Special Permit on August 30, 2018, and its application for a Use Variance on August 31, 2018 (collectively, the "Zoning Application").

53.     T-Mobile's Zoning Application and plans meet the requirements of the Zoning Bylaw and applicable law for the issuance of the requested Special Permit or Use Variance.

54.     The ZBA first opened the hearing on T-Mobile's Zoning Application on September 26, 2018, and continued same to November 7, 2018, January 9, 2019, February 27, 2019, and March 27, 2019.

55.     At the March 27, 2019 ZBA hearing, T-Mobile sought to introduce evidence in support of its Zoning Application, including but not limited to affidavit and live testimony from its Site Acquisition Manager, Mr. Brian Sullivan.  However, the ZBA refused to hear T-Mobile's evidence.

56.     At the March 27, 2019 hearing, the ZBA voted to deny T-Mobile's Zoning Application.

57.     On April 10, 2019, the ZBA issued a written decision denying the Special Permit application, and a separate written decision denying the Use Variance.

58.     Attached hereto as Exhibit 1 is a true and correct copy of the ZBA's written decision denying the Special Permit.

59.     Attached hereto as Exhibit 2 is a true and correct copy of the ZBA's written decision denying the Use Variance.

60.     In both the Use Variance Denial and the Special Permit Denial, the ZBA concluded that it lacked the jurisdiction to grant either the Special Permit or Use Variance because, it argued, under Section 240-130.3 of the Town's Zoning Bylaw wireless telecommunications service is not a permitted use in the CVD.

61.     In the Special Permit Denial, the ZBA stated that it could not provide the Special Permit because T-Mobile's application sought to change the use of the Subject Property to a use not otherwise permitted, rather than an alteration of a building or structure.

62.     In the Use Variance Denial, the ZBA stated that it could not provide the Use Variance because Section 240-125.B(1)(e) is not incorporated into the CVD, and thus the ZBA lacks the power to grant a use variance for a use within the CVD.

63.     The ZBA failed to consider the merits of T-Mobile's Zoning Application.

64.     There is no record evidence refuting T-Mobile's demonstration that it meets the requirements for granting the requested Special Permit under 240-130.4.B(2) of the Town's Zoning Bylaw, or that it meets the requirements for granting the requested Use Variance under 240-125.B(1)(e) of the Town's Zoning Bylaw, other than the ZBA's statement that it lacks jurisdiction.

65.     The ZBA declined to allow T-Mobile to present evidence at the hearing concerning its significant gap in service or its evaluation of potential alternatives.

### The Application for Regulatory Agreement

66.     On January 10, 2019, T-Mobile and South Congregational Church, Inc. filed an Application for a Regulatory Agreement with the Town's Planning Board concerning the Proposed Facility.

67.     In the materials submitted in support of its Application for a Regulatory Agreement, among other things, T-Mobile included an affidavit from its site acquisition specialist, Mr. Boswick of J. Lee Associates, Inc., radio frequency coverage plots showing T-Mobile's existing coverage in the vicinity of the Subject Property, T-Mobile's search ring, and data from drive tests T-Mobile conducted to demonstrate the significant gap.

68.     The Town hired CityScape Consultants, Inc. ("CityScape"), a telecommunications consultant firm, to evaluate T-Mobile's selection of the Subject Property.  CityScape concluded that T-Mobile had justified its need for a new facility and there were no other existing structures, save for the Subject Property, that would allow T-Mobile to remedy its significant gap in service.

69.     At hearings before the Planning Board on January 28, February 11, and February 25, 2019, T-Mobile presented substantial and uncontroverted evidence that it had complied with the requirements of the Town's regulatory agreement ordinance, M.G.L. c. 40A and all applicable laws.  T-Mobile's presentation included testimony by its site acquisition manager, Mr. Sullivan, also of J. Lee Associates, and RF engineering expert.

70.     The Planning Board acknowledged that CityScape had provided a report evaluating T-Mobile's application materials.

71.     Following the above-referenced hearings, on March 26, 2019, the Town's Planning Board issued a decision not to recommend execution of T-Mobile's proposed regulatory agreement, specifically because it asserted that T-Mobile had failed to prove that there

14

were no other equally viable and technically equivalent or superior locations where T-Mobile could install its equipment and remedy its significant gap.

72.     The Planning Board did not include CityScape's conclusion—that T-Mobile had justified its need for a new facility and there were no other existing structures, save for the Subject Property, that would allow T-Mobile to remedy its significant gap in service—in its Findings of Fact.

73.     The Planning Board admitted that opposition to T-Mobile's request included health concerns related to RF emissions.

74.     Attached hereto as Exhibit 3 is a true and correct copy of the Planning Board's written decision.

**The Town's Denial Violates the Communications Act**

75.     The Town's denials of the Zoning Application and Application for Regulatory Agreement (collectively, the "Town's Denial") runs contrary to the express purpose of and violates the Communications Act.

76.     There is no evidence disputing the existence of a significant gap in T-Mobile's service in the vicinity of the Subject Property.

77.     T-Mobile has presented substantial and uncontroverted evidence in its application materials to the Planning Board and ZBA and at the hearing before the Planning Board concerning its significant gap in service.

78.     T-Mobile has presented substantial and uncontroverted evidence in its application materials to the Planning Board and ZBA that it thoroughly investigated the possibility of other viable alternatives, but that no other feasible plan was available.

79.     There is no record evidence refuting T-Mobile's demonstration that it investigated thoroughly the possibility of other viable alternatives before concluding that no other feasible plan was available.

80.     There is no evidence demonstrating the existence of viable alternatives that would remedy the significant gap in T-Mobile's services.

81.     There is no record evidence that approval of the Zoning Application would be inconsistent with or violate the Town's Bylaws or any other applicable law.

82.     There is no record evidence that T-Mobile's Application for a Regulatory Agreement fails to meet the requirements for same under the Town's Bylaw.

83.     There is no record evidence that T-Mobile's Zoning Application and Application for a Regulatory Agreement fails to meet the requirements under the Town's Zoning Bylaw.

84.     There is no substantial evidence to dispute any of the evidence submitted by T-Mobile.

85.     T-Mobile has complied with all applicable procedural and substantive requirements of the Town's Bylaws and satisfied all applicable requirements and conditions precedent to obtain the requested relief from the Town which would allow it to operate the already-built Proposed Facility on the Subject Property.

86.     The Planning Board filed its written decision with the Town Clerk on March 26, 2019.

87.     The ZBA filed its written decisions with the Town Clerk on April 10, 2019.

88.     The Planning Board's decision was final on March 26, 2019, and the ZBA's decisions were final on April 10, 2019.

89.     This Complaint is timely filed within thirty days of the Planning Board and ZBA's final denials pursuant to 47 U.S.C. § 332(c)(7)(B)(v).

**COUNT I**
**(Violation of 47 U.S.C. § 332(c)(7)(B)(iii) – Lack of Substantial Evidence)**

90.     T-Mobile incorporates by reference and realleges the foregoing factual allegations in paragraphs 1 through 89 as if fully set forth herein.

91.     Pursuant to 47 U.S.C. § 332(c)(7)(B)(iii), "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

92.     T-Mobile presented to both the Planning Board and the ZBA substantial and uncontroverted evidence that it has fully complied with all requirements of the Zoning Bylaw, M.G.L. c. 40A, and all applicable laws.  T-Mobile provided the Planning Board and the ZBA with documents from its site acquisition representative and RF expert.

93.     T-Mobile's site acquisition representative and RF expert presented testimony to the Planning Board.

94.     T-Mobile provided substantial and uncontroverted evidence, consistent with the Town's Bylaws and M.G.L. c. 40A and sufficient to determine that literal enforcement of the Town's Zoning Bylaw would involve substantial hardship to T-Mobile, and that granting the Zoning Application would not involve substantial detriment to the public good, nor would it substantially derogate from the Zoning Bylaw's purpose.  There is no record evidence refuting T-Mobile's substantial evidence that it met these criteria.

95.     T-Mobile provided substantial and uncontroverted evidence, consistent with the Town's Bylaws and M.G.L. c. 40A and sufficient to determine that operation of the Proposed

17

Facility is a use in harmony with the general purpose and intent of the Town's Zoning Bylaw. There is no record evidence refuting T-Mobile's substantial evidence that it met these criteria.

96.     T-Mobile presented substantial and uncontroverted evidence in its applications to the Planning Board and to the ZBA and at the hearing before the Planning Board regarding T-Mobile's significant gap in service.  T-Mobile produced live testimony from a radio frequency engineer, supported by radio frequency propagation maps depicting the significant gap in T-Mobile's existing network coverage, a radio frequency propagation map depicting the company's anticipated coverage from the Proposed Facility on the Subject Property, and data demonstrating that T-Mobile's network lacked sufficient capacity to provide service in the area, thereby demonstrating the existence of the significant gap in service.

97.     T-Mobile presented substantial and uncontroverted evidence in its applications to the Planning Board and to the ZBA and at the hearing before the Planning Board demonstrating that T-Mobile investigated thoroughly the possibility of other viable alternatives before concluding no other feasible plan was available.

98.     The Planning Board's written denial ignores the affidavit of T-Mobile's site acquisition representative, and states that T-Mobile did not provide any factual basis to support its assertion that T-Mobile was unable to secure permission from the owners of several of the proposed properties to lease same and install the Proposed Facility.

99.     The ZBA refused to accept or hear T-Mobile's evidence and testimony at its March 27, 2019 hearing.

100.     There is no record evidence that the approval of the Zoning Application or Application for a Regulatory Agreement would be inconsistent with or would violate the Town's Bylaw or any other applicable law.

101.    There is no substantial evidence to dispute any of the evidence submitted by T-Mobile.

102.    There is no evidence disputing the existence of a significant gap in T-Mobile's service in the vicinity of the Subject Property.

103.    There is no evidence demonstrating the existence of viable alternatives that would remedy the significant gap in T-Mobile's service.

104.    The Town's Denial is not supported by substantial evidence contained in the written record.

105.    Consequently, the Town's actions are in violation of, and preempted by, Section 332(c)(7)(B)(iii) of the Communications Act, and should be set aside and enjoined by the Court on that basis.  Further, this Court should exercise its power to issue an order directing the Town to approve the Zoning Application and Application for Regulatory Agreement for the Proposed Facility.

## COUNT III
### (Violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) – Effective Prohibition)

106.    T-Mobile incorporates by reference and realleges the foregoing factual allegations in paragraphs 1 through 105 as if fully set forth herein.

107.    Pursuant to 47 U.S.C. § 332(c)(7)(B)(i)(II), "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government of instrumentality thereof ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(II).

108.    In *In the Matter of Acceleration of Broadband Deployment by Removing Barrier to Infrastructure Investment,* Declaratory Ruling and Third Report and Order, 33 FCC Rcd. 9088, 2018 WL 4678555 (2018) (Sept. 27, 2018) (the "*FCC 2018 Order*"), the FCC issued a

declaratory ruling that definitively interpreted the "effective prohibition" language of Section 332(c)(7)(B)(i)(II).  The FCC declared that the standards adopted by the First Circuit and other courts applying Section 332(c)(7)(B)(i)(II) were incorrect.  *Id.* n.94.  Instead, the FCC declared that "an effective prohibition [of service] occurs where a state or local legal requirement ***materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service.*"  *Id.* ¶ 37 (emphasis added).  The FCC made clear that the Town effectively prohibits the provision of wireless services if it inhibits or limits T-Mobile "not only when filling a coverage gap ***but also when densifying a wireless network, introducing new services or otherwise improving service capabilities***."  *Id.* ¶ 37 (emphasis added).  The FCC also made clear that an effective prohibition includes inhibiting a provider from deploying the "performance characteristics" of its choosing.  *Id.* n.86.  The *FCC 2018 Order* also declares that local governments cannot deny an application for a wireless site based on the alleged existence of alternative locations.

109.    The *FCC 2018 Order* is currently in effect, and it governs T-Mobile's claim under 47 U.S.C. § 332(c)(7)(B)(i)(II).

110.    Under the *FCC 2018 Order*, T-Mobile has identified an area in which T-Mobile needs to install a wireless facility to provide coverage, network capacity, and ultimately provide service.  The Town's Denial of T-Mobile's Zoning Application and Application for a Regulatory Agreement materially inhibit or limit T-Mobile's ability to install its facilities and provide the services at levels it deems appropriate.  Accordingly, the Town's Denial effectively prohibits T-Mobile from providing personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).

111.    In addition, or in the alternative, even following the standard for claims under Section 332(c)(7)(B)(i)(II) previously adopted by the First Circuit, the Town's Denial of T-

Mobile's Zoning Application and Application for a Regulatory Agreement effectively prohibits T-Mobile from providing personal wireless service in violation of Section 332(c)(7)(B)(i)(II).

112.     T-Mobile has a significant gap in personal wireless service in the area surrounding the Proposed Facility.

113.     There is no existing structure or property in or near the search area in the vicinity of the Proposed Facility that is both reasonably available and technologically feasible to remedy T-Mobile's significant gap in personal wireless service in the area.

114.     T-Mobile investigated thoroughly the possibility of other viable alternatives but no other feasible plan is available to remedy T-Mobile's significant gap.

115.     As discussed above, T-Mobile investigated multiple other properties, including the Christian Camp Meeting Association, Trade Winds Development-A, Inc., Our Lady of Victory Church, the Beach Club of Craigsville, and the Centerville Water Tower.

116.     There are no viable alternatives to the Proposed Facility that will remedy T-Mobile significant gap in service.

117.     The Town's Denial of the Zoning Application and Application for a Regulatory Agreement effectively prohibits T-Mobile from providing personal wireless service in the area surrounding the Proposed Facility.

118.     Consequently, the Town's Denial is in violation of, and preempted by, Section 332(c)(7)(B)(i)(II) of the Communications Act, and should be set aside and enjoined by the Court on that basis.  Further, this Court should exercise its power to issue an order directing the Town to approve the Application for the Proposed Facility.

## COUNT III
**(Violation of 47 U.S.C. § 332(c)(7)(B)(iv) – Unlawful Denial On the Basis of Environmental Effects of Radio Frequency Emissions)**

119.    T-Mobile incorporates by reference and realleges the foregoing factual allegations in paragraphs 1 through 118 as if fully set forth herein.

120.    Pursuant to 47 U.S.C. § 332(c)(7)(B)(iv), "[n]o State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions."

121.    The Planning Board stated that the opposition to the Proposed Facility included "health-related concerns."

122.    On information and belief, all other opposition to the Proposed Facility was also based on concerns about the environmental effects of radio frequency emissions.

123.    There is no record evidence refuting T-Mobile's demonstration that the maximum permissible exposure levels from the Proposed Facility will be far below the relevant FCC exposure limits for electromagnetic fields.

124.    The antennas for the Proposed Facility are entirely concealed within the steeple of the church.  Thus, objections cannot be based on aesthetics.

125.    On information and belief, the Town's real grounds for denial of T-Mobile's Zoning Application and Application for a Regulatory Agreement is based on concerns about the alleged environmental effects of RF emissions.

126.    Accordingly, the Town's Denial of the Proposed Facility constitutes an unlawful denial based on concerns about the health and environmental impacts of RF emissions in violation of the Communications Act.

127.    Consequently, the Town's Denial of T-Mobile's Zoning Application and Application for a Regulatory Agreement for the Proposed Facility is in violation of, and preempted by, Section 332(c)(7)(B)(iv) of the Communications Act, and should be set aside and enjoined by the Court on that basis.  Further, this Court should exercise its power to issue an order commanding the Town to approve the Proposed Facility for which T-Mobile applied.

**WHEREFORE**, T-Mobile demands judgment against the Town as follows:

1.      An expedited review of the matters set forth in this Complaint pursuant to 47 U.S.C. § 332(c)(7)(B)(v);

2.      A declaration and judgment that the Town's Denials are not supported by substantial evidence in the written record and are therefore in violation of and preempted by 47 U.S.C. § 332(c)(7)(B)(iii);

3.      A declaration and judgment that the Town's Denials have the effect of prohibiting T-Mobile from providing personal wireless service in violation of and preempted by 47 U.S.C. § 332(c)(7)(B)(i)(II);

4.      A declaration and judgment that the Town's Denials were unlawfully based on concerns regarding the effects of radio frequency emissions in violation of and preempted by 47 U.S.C. § 332(c)(7)(B)(iv);

5.      An order requiring the Town to grant the Zoning Application and Application for a Regulatory Agreement and thereby approve the Proposed Facility;

6.      An order directing the Town to issue all ancillary approvals and permits necessary for the operation of the Proposed Facility;

7.      An award of T-Mobile's costs, including reasonable attorneys' fees; and

8.      Such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

T-MOBILE NORTHEAST LLC

By its attorneys,

*/s/ Caitlin A. Romasco*
William A. Worth, BBO #544086
wworth@princelobel.com
Caitlin A. Romasco, BBO #684594
cromasco@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
Telephone:  (617) 456-8000
Fax:  (617) 456-8100

T. Scott Thompson (pro hac vice forthcoming)
Patrick J. Curran Jr. (pro hac vice forthcoming)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave. NW, Suite 800
Washington D.C. 20006
202-973-4200
scottthompson@dwt.com
patcurran@dwt.com

Dated: April 25, 2019